# Exhibit A

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK


------------------------------------X
UNITED STATES OF AMERICA,           :  07-CR-907 (SAS)
                                    :
                  v.                :  October 10, 2007
                                    :
MELICHAREK, et al.,                 :  500 Pearl Street
                                    :  New York, New York
                  Defendants.       :
------------------------------------X


         TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
            BEFORE THE HONORABLE MICHAEL H. DOLINGER
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          United States Attorney's Office
                             BY:  ELI HOENIG, ESQ.
                             Assistant United States Attorney
                             One Saint Andrew's Plaza
                             New York, New York  10007

For Defendant Iuni:          ALAN NELSON, ESQ.

For Defendant Nicosia:       PAUL MCALLISTER, ESQ.

For Defendant Pipolo:        SHERYL REISCH, ESQ.
                             Law Office of Gerald B. Lefcourt
                             148 East 78th Street
                             New York, New York  10075

For Defendant Celaj:         XAVIER R. DONALDSON, ESQ.
                             Donaldson, Chilliest & McDaniel

For Defendant Melicharek:    JOHN MERINGALO, ESQ.



Court Transcriber:           CARLA NUTTER
                             TypeWrite Word Processing Service
                             356 Eltingville Boulevard
                             Staten Island, New York 10312



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
                                                                  22
 1   bespeaks violence in any manner whatsoever.
 2             THE COURT:  On balance and given both the nature of
 3   the defendant's record which does not seem to have improved
 4   with age and the fact that he was apparently and sufficient --
 5   whatever the details may be -- sufficiently in violation of
 6   conditions of release that he was violated as recently as 1999
 7   I'm satisfied that the government has met its burden to
 8   establish that there are no conditions of bail that would
 9   assure defendant's return to face the charges and the safety of
10   the community.  Accordingly, this defendant will be detained
11   pending trial.
12             Okay.  I'll hear from the government with regard to
13   Mr. Celaj.  Let me though, first, just review the Pretrial
14   Services report.
15                  [Pause in proceedings.]
16             THE COURT:  Okay.
17             MR. HOENIG:  Judge, we seek detention of Mr. Celaj.
18   Again, Pretrial Services recommends detention.  We think it's
19   pretty clear why we have that recommendation.
20             First of all, Mr. Celaj is a green card holder
21   meaning that if he is convicted on any of these charges he will
22   almost to a certainty be deported so that's an incentive to
23   take off; why sit around wait for trial, wait to serve jail
24   time and then go when he could just leave and end up back home
25   where he's from.  He has an Albanian passport, he has family in
```

23

1  Albania and he is a citizen.
2             This is a presumption case.  Mr. Celaj is charged
3  with two separate 924(c) charges as well as with participating
4  in two separate Hobbs Act robberies -- home break-ins.  I want
5  to give the Court a little bit of detail about these break-ins
6  because I think it's important to the consideration here.
7  Several of the defendants were charged here including
8  Melicharek, Memoli and Pipolo came up with this scheme where
9  they would set up home invasions of individuals who they knew
10 were engaged in business and who they suspected would have
11 large sums of cash or other valuables in their home.  They
12 targeted the homes, they did surveillance on the homes, it's
13 people they knew more or less and then they broke into the
14 homes.  There are two specific robberies -- home break-ins --
15 that are alleged here.  Mr. Celaj participated in both of them
16 and for the Court's reference, Mr. Pipolo, who is coming up
17 next, participated in one of them.
18            Mr. Celaj, in a nutshell, was hired muscle for the
19 Genovese family.  He along with defendant Gjelaj, who is in
20 state prison and not yet brought into this District, were the
21 people they went and hired to help them break into the homes
22 and to do the robberies.  Essentially what that defendants
23 would do is they would -- like I said, they would target the
24 homes.  The first one was in Morris County, New Jersey and this
25 is alleged in the indictment.  In that case they broke into a

24

home, a private residence, tied up or taped up the victims including the intended victim who was a male as well as his family, I believe his wife, children, tied and taped those people up, pistol whipped the victim across the head and forced the victim to open up his safe and they made off with about $80,000.00 in cash as well as coins, jewelry and other valuables. You know, I think those actions speak for themselves. They broke into a private home, tied up an innocent family, physically assaulted the primary victim and made off with quite a bit of property and Mr. Celaj was on the break-in team there and he was essentially brought in for that purpose. Like I said, he's hired muscle.

About a month or so later, given the success that they had the first time, they decided to try it again. This time they targeted an individual who lived in Orange County, New York who they believed would have significant cash assets in the home and it was more or less the same pattern again. Mr. Celaj was brought in to be a key man in the break-in crew. They did the break-in. They, again, physically restrained someone who was in the home, this time for reasons that I won't go into here they weren't successful in getting anything but they did the break-in, there certainly was a violent act there and there certainly was an attempt. Both times involved guns. That's why Mr. Celaj and others are facing two 924(c) charges. It is a presumption case as a result. It's really a

```
                                                                    25
 1   presumption case several times over.
 2            Mr. Celaj is facing enormous exposure.  On top of
 3   whatever he's going to get for the Hobbs Act break-ins
 4   themselves he's facing, of course, the five year mandatory
 5   consecutive for the first 924(c) and a 25 year mandatory
 6   consecutive for the second 924(c).  In addition, he does have
 7   some prior criminal history.  He was convicted of an aggravated
 8   harassment in 2004.  I believe it's a misdemeanor but he
 9   received a sentence of three years probation and I'd point out
10   that that plea was entered just after the charged events here.
11   He was arrested in both January and February 2007 on separate
12   cases and has bench warrants pending on both of those cases.
13   I'm sure there will be some explanation from Mr. Celaj as to
14   why that is but we do have two outstanding bench warrants on
15   him.
16            Given his green card status, given the near certainty
17   of deportation, given the presumption, given the violent nature
18   of these cases and given the enormous exposure he's facing he's
19   both a risk of flight and a danger and needs to be detained.
20            THE COURT:  Thank you.  Mr. Donaldson.
21            MR. DONALDSON:  Yes, Your Honor.  If I could have one
22   second?
23            [Pause in proceedings.]
24            MR. DONALDSON:  First and foremost, I do not believe
25   that the warrants that the government is saying my client has
```

```
                                                              26
 1   currently are active warrants.  I believe that the Yonkers
 2   case, particularly from I believe earlier this year of 2007, if
 3   indeed it was in fact a valid warrant or viable warrant would
 4   have shown on the state issued RAP sheets I was provided,
 5   although I do see a computer printout.  It is my experience --
 6   and I don't know if it's the Court's experience -- but it is my
 7   experience in doing a significant amount of state court work
 8   that when the warrants are on the computer sheets and not on
 9   the actual RAP sheets that don't show as arrest then they are
10   not active warrants.
11            THE COURT:  I do note that one of them is described
12   as a bench warrant and one of them is described as an arrest
13   warrant.
14            MR. DONALDSON:  In Yonkers, Your Honor, I believe
15   often times the persons are not actually arrested but someone
16   may come in and provide some kind of report and then an arrest
17   warrant or bench warrant is just activated.  The person does
18   not know about that so inasmuch there's no intent by the
19   person, specifically Mr. Celaj, to absent himself from a
20   Yonkers courtroom.  That's why it's not showing up and there's
21   no intent by Mr. Celaj to absent himself.
22            Secondly, the other warrant that the prosecution is
23   referring to that, again, I don't see on RAP sheet --
24            THE COURT:  I think there is a reference on Page 3 of
25   the RAP sheet, there's one dated April 23, 2007.
```

```
                                                                    27
 1              MR. DONALDSON:  That's correct.  It refers to --
 2              THE COURT:  It says "bench warrant issued,
 3   disposition pending."
 4              MR. DONALDSON:  It refers to a February 25, 2007
 5   Manhattan arrest.  It is my belief -- and I tried to do a
 6   little investigation on the docket number referred to in that
 7   particular bench warrant issued and I would ask the Pretrial
 8   Services Office or the government at a later time to recheck
 9   that because I think after rechecking of that that's going to
10   come up as well as no longer violated but I want to get more to
11   the case of why I believe Mr. Celaj would be a good candidate
12   for a package and just to say it up front, our proposed package
13   is a -- well, I'll say it this way -- Mr. Celaj's family has
14   three significant houses they can put up with equity of between
15   $600,000.00 and $700,000.00.  We have the addresses for those
16   houses and I'm prepared to give those to the government as part
17   of a $750,000.00 bond package.  We'd also submit to the Court
18   that Mr. Celaj's family can provide a significant amount of
19   cash, between $25,000.00 and $50,000.00.  He would be able to
20   get five signatures to sign for him.  We do not object to any
21   type of home confinement or bracelet wearing that would satisfy
22   any concern by the government that he's a flight risk.  They
23   would be able to monitor his every move if that's what happens.
24              But unlike the other persons or unlike the
25   government's other arguments, Mr. Celaj does work, he works a
```

28

1  very good job.  His boss or a cousin or family members who he
2  works with are in the courtroom today, his fiancé is in the
3  courtroom today.  He's been working at that current job as a
4  loan officer/broker for the last eight months.  Prior to that
5  he worked in the family business for the last three or four
6  years.
7       Although the government says he's from another
8  country and has a passport he doesn't in fact have one.  He
9  came over to this country, I believe, in 1990 and has not left
10 since.  He's been here for the last seventeen years and has not
11 traveled abroad one time.  So although the Pretrial Services
12 report says that he has family ties to Albania he hasn't in
13 fact used those family ties in any way, shape or form to go
14 back to Albania to visit.  He's remained in America since 1990
15 and has no intention of traveling back to Albania.
16      As the prosecutor indicated, he did have three years
17 probation but I think that's also important, he completed his
18 probation without any type of rearrest or without any type of
19 violation --
20      [End of Tape 1, beginning of Tape 2 as follows]
21      MR. MCDONALD:  -- went to his Probation officer every
22 month for three years, he maintained employment at his post of
23 the last three years and he hasn't had any type of police
24 conduct during those three years that would indicate that he is
25 compliant with court processes.

29

As the government also indicated he is a legal resident and because we feel that -- although they're saying he has these 924(c) -- it's also striking -- this is a 2003 case. They're claiming that this case is extremely strong, etc., etc., but I would remind the Court this is a 2003 case -- facts from 2003. Four years have transpired. We believe that the facts are not as strong as they think they are. This is an identity case. We do not believe that Mr. Celaj was in any way, shape or form involved in these push-in robberies or any of these Hobbs Act robberies or this conspiracy. As such, we believe that the package that we've proposed -- the $750,000.00 package with three houses, $25,000.00 to $50,000.00 cash, five signatures, of course, restricting his travel to the Eastern and Southern District and also Connecticut because that's where he resides, as well as the bracelet if the Court so deserves [sic] a home confinement, we believe that those packages would overcome any presumption of violence or a risk of flight.

THE COURT: Do you disagree with the government's calculation of the exposure that the defendant faces?

MR. DONALDSON: Judge, there are a couple of cases that came out recently regarding the 924(c) and the calculation of whether it's a five or 25 thereafter. Also, I think it's very correct -- well, to answer the question, yes, but also I think it's also notable that in the government's recitation of facts of this tying up or taping up or pistol whipping or

```
                                                                    30
 1   anything like that and these very specific facts, there's no
 2   indication whatsoever that Mr. Celaj had anything to do with
 3   any of that but I understand it's a conspiracy case, I do
 4   understand that, but we firmly believe that it is also an
 5   identification case.  We firmly believe that these facts that
 6   they have generated come from 2003 and that Mr. Celaj is not
 7   the person who they are saying is involved in these particular
 8   robberies.  That's what we believe at this point.
 9           We do believe that -- I mean the United States Code
10   exposure for Mr. Celaj, that's something we'll have to get into
11   later.  If he's convicted, of course, of the extortion, robbery
12   then the possession of gun and further robberies and the
13   subsequent one after that I do not have the case law in front
14   of me right now but I believe there are recent cases that have
15   a different interpretation of what his actual exposure is.  I
16   wasn't prepared for that question right now so I don't have the
17   answer right now but I do not agree with that at this point.
18           THE COURT:  Anything else at this point?
19           MR. DONALDSON:  No, Your Honor.
20           THE COURT:  Thank you.  Anything further from the
21   government?
22           MR. HOENIG:  Your Honor, just to clarify we're not
23   alleging that Mr. Celaj was some sort of planner here, he was
24   in on the planning but he was a break-in guy.  He was in the
25   home doing the tying up and doing the robbing.  I think Mr.
```

```
                                                                    47
 1                         *  *  *  *  *
 2       I certify that the foregoing is a transcript from an
 3   electronic sound recording of the proceedings in the above-
 4   entitled matter.
 5
 6                         _____
 7                                  CARLA NUTTER
 8
 9   Dated:   October 18, 2007
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```